**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **ROBERT EDWARD RICHARDSON** | § | |
| **#468111** | § | |
| | § | |
| **V.** | § | **W-20-CA-130-ADA** |
| | § | |
| **LORIE DAVIS** | § | |

**ORDER**

Before the Court are Plaintiff's Complaint (#1), Plaintiff's supplements (#19, 31, 33, 37, 39), Plaintiff's response to Defendant's Answer (#36), Defendant's Motion for Summary Judgment (#49), and Plaintiff's Responses (#51, 52, 53, 54, 55, 56, 57), and Plaintiff's supplements (#23, 30, 31). Plaintiff is proceeding pro se and in forma pauperis.

STATEMENT OF THE CASE

At the time he filed his complaint pursuant to 42 U.S.C. § 1983, Plaintiff was confined in the Texas Department of Criminal Justice—Correctional Institutions Division. Plaintiff alleges that Defendant has violated his constitutional rights by not allowing him to practice his religion and by holding him in administrative segregation. Plaintiff brings claims under 42 U.S.C. § 1983 for violation of his First Amendment rights and his Eighth Amendment rights and under 42 U.S.C. § 2000cc-1(a), the Religious Land Use and Institutionalized Persons Act (RLUIPA). Plaintiff sues Lorie Davis in both her individual and official capacities. Plaintiff seeks injunctive relief and damages.

1

DISCUSSION AND ANALYSIS

A.    Factual Background

Plaintiff has been incarcerated at TDCJ since 1987. On September 27, 1995, Plaintiff was charged with possession of a deadly weapon in a penal institution. Plaintiff was eventually convicted in 1998 of both aggravated assault and possession of a deadly weapon in a penal institution. Subsequently, on May 6, 2000, Plaintiff was involved in an incident at the Stiles Unit. Plaintiff took two nurses hostage, and also stabbed the warden in the arm and rib cage. Two additional TDCJ employees were injured while subduing Plaintiff. Plaintiff was eventually convicted in 2003 of attempted capital murder stemming from this incident. Plaintiff contends that at the time of the hostage-taking and assault he was experiencing a psychotic break due to issues with his medications. As a result of this history of incidents during Plaintiff's incarceration, Plaintiff carries the "hostage taker" and "staff assaultive" security precaution designators and has been confined to administrative segregation or chronically mentally ill sheltered housing since at least 2000.

Plaintiff began participating in the Mental Health Therapeutic Diversion Program on April 29, 2019. When a participant completes the Mental Health Therapeutic Diversion Program, the State Classification Committee may consider completion of the program when determining security precaution designators and custody level. Plaintiff's classification was reviewed on January 29, 2020, by the Unit Classification Committee. No change in custody level was granted. Plaintiff's medical records indicate that as

recently as March 23, 2020, he continued to suffer from auditory illusions, stating that he had "5 voices in my head now."

Plaintiff asserts claims regarding two distinct issues. First, Plaintiff claims that TDCJ has kept him in administrative segregation for 20 years, despite the fact that for the last 15 years his behavior has been "outstanding" and he has not received any disciplinary cases. Plaintiff contends that this shows he is no longer a threat to himself or others and that TDCJ should release him back into general population. Plaintiff also contends that although he has been moved to chronically mentally ill sheltered housing, that is actually just administrative segregation by a different name which allows TDCJ to keep him in administrative segregation. Plaintiff seeks to be allowed back into general population custody.

Second, Plaintiff complains that his religious rights are being infringed. Specifically, he claims that he is a member of the Native American shamanic religion. Plaintiff contends that he has been denied permission to grow long hair, is not allowed to wear his leather headband at all times, is not allowed to wear his medicine pouch at all times, is not allowed to obtain Sacred Lakota Sweat Lodge Medicine Cards for divination, and he is not allowed to have a dreamcatcher. Plaintiff claims that he believes that if his hair is not kept long, he will not be recognized by his ancestors in the afterlife. Although Plaintiff admits that he is allowed to wear his leather headband when he is in his cell or during religious ceremonies, he claims that other religions are allowed to wear their "headgear" anywhere and anytime. Plaintiff contends that he should be given the same treatment. As for his medicine pouch, he likewise admits that he can wear it at any time in his cell

and during religious ceremonies. Plaintiff argues, however, that he should be allowed to wear it all of the time in case he "could be at a place and feel the need to pull out a certain sacred item and use it." Plaintiff likewise contends that his medicine cards and dreamcatcher are not a security threat and therefore he should be allowed to have them. Plaintiff seeks to be allowed to grow his hair long and not be forced to cut it, to wear his leather headband and medicine pouch anywhere and anytime within TDCJ, and to be allowed to obtain sacred medicine cards and a dreamcatcher.

B.    Summary Judgment Standard

A court will, on a motion for summary judgment, render judgment if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). When a motion for summary judgment is made and supported, an adverse party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial.  *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir. 1995); Fed. R. Civ. P. 56.

Both movants and non-movants bear burdens of proof in the summary judgment process.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322. In so doing, the moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses.  *Id.* at 323-24. At that point, the burden shifts to the non-moving party to

"produce evidence in support of its claims or affirmative defenses . . . designating specific facts showing that there is a genuine issue for trial." *Id.* at 324. The non-moving party must produce "specific facts" showing a genuine issue for trial, not mere general allegations. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, the Court should view the evidence in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in favor of that party. The Fifth Circuit has concluded "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

C.    Eleventh Amendment Immunity

Pursuant to the Eleventh Amendment, federal courts are without jurisdiction over suits against a state unless that state has waived its sovereign immunity or Congress has clearly abrogated it. *Moore v. La. Bd. of Elementary and Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). The Eleventh Amendment may not be evaded by suing state agencies or state employees in their official capacity because such an indirect pleading remains in essence a claim upon the state treasury. *Green v. State Bar of Texas*, 27 F.3d 1083,1087 (5th Cir. 1994). Being sued in her official capacities for monetary damages, Defendant is immune from suit under the Eleventh Amendment because such an action is the same as

a suit against the sovereign. *Pennhurst State School Hosp. v. Halderman*, 465 U.S. 89 (1984).

However, the Eleventh Amendment does not apply to a request for a federal court to grant prospective injunctive relief against state officials on the basis of federal claims; thus, a request for prospective injunctive relief against state officials or employees in their official capacities falls within an exception to Eleventh Amendment immunity. *See Ex parte Young*, 209 U.S. 123, 149 (1908).

D.    Administrative Segregation

Plaintiff complains that he has been held in either administrative segregation or chronically mentally ill sheltered housing for 20 years. While Plaintiff's time in administrative segregation or chronically mentally ill sheltered housing has been extensive, it does not rise to the level of an Eighth Amendment or due process violation. Plaintiff contends that he should not be held in chronically mentally ill sheltered housing because he is not mentally ill. Plaintiff's overall complaint is twofold. He complains that he should not be held in administrative segregation on the basis of his previous violent action because it happened so long ago, and he has been well-behaved for at least 15 years. Plaintiff also contends that he is being treated as if he has a psychotic condition when he does not.

Placement in solitary confinement does not implicate a protected liberty interest "unless it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Thus, absent extraordinary

circumstances, "administrative segregation . . . will never be a ground for a constitutional claim." *Id.* Such extraordinary circumstances are rarely found. *See e.g. Wilkerson v. Stalder*, 329 F.3d 431, 436 (5th Cir. 2003) (holding only that due process *might* have been violated where plaintiffs had been kept on lockdown status for 30 years); *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005) (holding that transfer to a "Supermax" facility for an indefinite time where almost all human contact is prohibited implicated a protected liberty interest).

Plaintiff's placement in administrative segregation has not reached the thirty-year period experienced by the plaintiffs in *Wilkerson*, nor are the conditions he faces anywhere near as extreme as those found at Ohio's "Supermax" facility. Furthermore, Plaintiff admits that his custody level has been revisited frequently by the unit classification committee and state classification committee. Most recently, on January 29, 2020, Plaintiff's status was reviewed after he completed the mental health therapeutic diversion program. Plaintiff also indicates in a recent filing that he had another review regarding his classification on August 14, 2020. Thus, to the extent Plaintiff is entitled to some due process, he has received such reviews regularly which have determined that administrative segregation or chronically mentally ill sheltered housing are the appropriate housing options. Furthermore, although Plaintiff indicates his belief that he would benefit from the chance to be in general population and that he could bring positive messages to other inmates, there is no indication that he is in any danger from his housing assignment. In addition, Plaintiff's medical records indicate continual struggles with mental health. It is far from clear that Plaintiff would be safe in general population,

notwithstanding his desire to be placed there, to say nothing of whether other inmates or prison staff would be safe considering Plaintiff's violent history and mental health issues.

It is not the purview of this Court to determine Plaintiff's mental health. It is sufficient that the Court review Plaintiff's treatment and determine, on the basis of constitutional law, that Plaintiff's rights are not being violated. Here, Plaintiff admits he has regular review by the classification committee. Even assuming that Plaintiff no longer suffers from the mental issues he previously experienced, there is no indication that Plaintiff's conditions are so extreme as to indicate an Eighth Amendment violation. Thus, Plaintiff has failed to allege the kind of extraordinary circumstances that would support a constitutional claim regarding his housing status.

E.      Constitutional Religious Freedom Claims

When analyzing a prisoner's claim under the First Amendment that a regulation violates his right to the free exercise of religion, the Court must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and whether the regulation is rationally related to that objective. The Supreme Court has identified four factors that are relevant: (1) whether there is a valid, rational connection between the regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exists alternative means for prisoners to exercise the constitutional right at issue; (3) the impact of an accommodation on prison staff, inmates, and allocation of prison resources; and (4) whether any alternative exists that would fully accommodate prisoners' rights at low costs to valid penological interests. *Turner v. Safley*, 482 U.S. 78,

89-91 (1987). No single factor is dispositive, and there is no requirement that all four factors be met. *Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77, 80 (5th Cir. 1992). Where a regulation restricts First Amendment rights in a neutral fashion, it is more likely to withstand judicial scrutiny. *McAlister v. Livingston*, 348 Fed. Appx. 923, 931-932 (2009) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989)). Furthermore, where a regulation restricts one aspect of an offender's belief system but the offender is able to participate in other religious observances of his faith, such a regulation is reasonable. *Id.* (citing *O'Lone v. Shabazz*, 482 U.S. 342, 352 (1987)).

Plaintiff claims that TDCJ policy limiting his ability to grow long hair and limiting the locations where he can wear a leather headband and carry a medicine bag are a violation of his First Amendment rights. Plaintiff also claims that TDCJ policy denying him access to medicine cards and a dreamcatcher are constitutional violations. Finally, Plaintiff claims that TDCJ violates his right to equal protection under the law because certain other inmates can allegedly wear their religious headgear without restriction.

Defendant has put forth undisputed summary judgment evidence showing that TDCJ's grooming policy, TDCJ's security policy relating to medicine cards and dreamcatchers, and TDCJ's policy limiting locations where headbands and medicine pouches are allowed to be worn are all rationally related to TDCJ's compelling interest in ensuring the safety and security of its facilities. As Plaintiff's own filings admit, his cards are forbidden due to the possibility of their use in gambling. Furthermore, dreamcatchers have been identified as a potential security hazard. Plaintiff disagrees that the medicine cards or dreamcatcher constitute a security issue. In addition, TDCJ's grooming policy is

used to afford safe and secure confinement and provide public safety. TDCJ uniformly requires male inmates to keep their hair trimmed up the back of their neck and head. One reason that TDCJ's grooming policy prohibits the growth of hair is that weapons or other contraband may be hidden, posing a security threat to the operations of the prison and endangering the safety of officers, staff, and offenders. Plaintiff is allowed to participate in various other modes of religious expression, and he admits that he does so. As an example, and as Plaintiff admits, he is free to wear his headband and medicine pouch for 23 hours each day.[1] Consequently, TDCJ's grooming policy and policies governing Native American religious items do not constitute violations of the First Amendment because they bear a rational relation to TDCJ's legitimate security interests. Defendant is entitled to summary judgment on Plaintiff's First Amendment claims as a matter of law.

Plaintiff also claims that the policy which forbids him from wearing his headband outside of his cell, except at religious ceremonies, violates the Equal Protection Clause. The Fourteenth Amendment's Equal Protection Clause commands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). In the context of prisoner litigation, the Supreme Court has not required that each religious denomination receive "identical facilities or personnel," but rather that "reasonable opportunities . . . be

---

[1] Plaintiff's housing assignments in both administrative segregation and chronically mentally ill sheltered housing limit him to one hour per day outside of his cell. Because the TDCJ policy on headbands and medicine pouches allows them to be warn at any time while in one's cell, Plaintiff is allowed to wear his headband and medicine pouch at least 23 hours per day.

afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). To survive summary judgment on his equal protection claim, Plaintiff needs to "allege and prove that he received treatment different from that received by similarly situated individuals." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (per curiam). In addition, he must also "demonstrate that prison officials acted with a discriminatory purpose" in treating him differently from other similarly situated prisoners. *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (per curiam). "'Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group.'" *Id.* (quoting *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992) (per curiam)); *see also Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 862-63 (5th Cir. 2004) (affirming summary judgment dismissal of prisoner's equal protection claim where prisoner "offered little or no evidence that similarly situated faiths [we]re afforded superior treatment, or that TDCJ's policy was the product of purposeful discrimination").

Plaintiff attempts to raise a comparison between himself and other religions at TDCJ that are permitted to wear their head coverings at all times. Notably absent from Plaintiff's comparison is any evidence supporting the allegation that inmates bearing similar security precaution designators and disciplinary histories are allowed greater permissions than he. Further, Plaintiff has produced no evidence of discriminatory intent. Defendant has put forth undisputed summary judgment evidence showing that the policy

forbidding Plaintiff to wear his headband outside of his cell bares a rational relationship to the specific institutional security concerns that Plaintiff presents. Any claim of disparate treatment ignores Plaintiff's unique situation in light of his custody status and the nature of his disciplinary history. For the foregoing reasons, Plaintiff has failed to provide competent summary judgment evidence of an Equal Protection Clause violation.

      2.   <u>RLUIPA Claims</u>

Plaintiff alleges that Defendants have violated his rights under RLUIPA by limiting his ability to grow long hair and limiting the locations where he can wear a leather headband and carry a medicine bag. Plaintiff also claims that TDCJ policy denying him access to medicine cards and a dreamcatcher is a violation of RLUIPA. "RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 612 (5th Cir. 2008). RLUIPA provides, in relevant part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). Under RLUIPA, Plaintiff carries an initial burden to show that

the challenged law, regulation, or practice substantially burdens the exercise of his religion. *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004). Once Plaintiff makes this showing, Defendants bear the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Id.*; *see also Sossamon v. Texas*, 563 U.S. 277, 281 (2011).  Defendants' burden "is not to show that it considered the claimant's proposed alternatives but rather to demonstrate those alternatives are ineffective." *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016).

To establish a "substantial burden" a prisoner must show that "it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins*, 393 F.3d at 570. That burden is satisfied if the prisoner shows that because of a government action, regulation, or restriction, he was (1) influenced to act in a way that violated his religious beliefs, or (2) forced to choose between enjoying a generally available benefit and following his religious beliefs. *See id.* "If the plaintiff meets this burden of proof, the burden shifts to the government to demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest." *DeMoss v. Crain*, 636 F.3d 145, 150 (5th Cir. 2011) (internal quotation marks and citation omitted).

As explained by the Fifth Circuit in *Davis v. Davis*, 826 F.3d 258 (5th Cir. 2016), Congress enacted RLUIPA to address "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, but expected courts entertaining RLUIPA challenges to also "accord 'due deference to the experience and expertise of prison and jail administrators.'" *Id.* at 264 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 716–17 (2005).

13

"Religious accommodations must not override other significant interests in maintaining order and safety, and courts should give deference to prison officials 'in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* at 264-65 (quoting *Cutter*, 544 at 723). Costs, limited resources, and prison security are all compelling state interests. *Cutter*, 544 at 723.

If the government succeeds in showing a compelling interest as applied to the specific inmate, it must then show that its policy is the least restrictive means of achieving that interest. "'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal'" other than the challenged policy. *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (alteration in original) (quoting *Hobby Lobby*, 134 S. Ct. at 2780). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)). RLUIPA compels a "fact-intensive inquiry" into the particular costs and risks that the requested exemption engenders. *Chance v. Tex. Dep't of Crim. Justice*, 730 F.3d 404, 418 (5th Cir. 2013) (*quoting Moussazadeh*, 703 F.3d at 795–96.

To the extent that Plaintiff seeks declaratory and injunctive relief under RLUIPA he has not carried his burden to show that the challenged practice substantially burdens the exercise of his religion. Plaintiff fails to make a prima facie case that he has been truly pressured to significantly modify his religious behavior and significantly violate his religious beliefs. *See Adkins*, 393 F.3d at 570. TDCJ's policies allowing headbands and

medicine pouches to be worn only in an inmate's cell or during religious ceremonies does not substantially burden Plaintiff's religious practice because his housing assignment requires him to remain in his cell, where he is free to wear both items, for 23 hours per day. Additionally, Plaintiff failed to provide any evidence supporting his assertion that TDCJ's denial of his requested medicine card deck and dreamcatcher constitute a violation of RLUIPA.

The Fifth Circuit applied a similar analysis to claims nearly identical to those raised by Plaintiff in *Diaz v. Collins,* 114 F.3d 69, 72 (5th Cir. 1997). In *Diaz,* the plaintiff was a TDCJ inmate held in administrative segregation that spent 22-hours per day in his cell. *Id.* Diaz complained that TDCJ's policy of allowing inmates to wear religious head bands and medicine pouches only in their cell and at religious ceremonies violated his rights under RFRA. *Id.* Diaz claimed that practitioners may feel the need to be connected to the sacred items in the medicine pouch and that the headband served as a reminder of his tribal traditions and creeds. *Id.* Considering Diaz's assertions in context with the policy's actual two-hour per day burden on Diaz's religious practices, the Fifth Circuit concluded that Diaz's claims did not rise to the level of a substantial burden on his religious practice. *Id.*

Plaintiff does not deny that the current policy allows him to wear his headband and medicine pouch for at least 23-hours per day. RLUIPA does not give prisoners an unfettered right to religious accommodations. *See Cutter*, 544 U.S. at 723–26. Plaintiff also has failed to provide any evidence establishing that TDCJ's denial of his requests causes him to violate his beliefs or choose between a non-trivial benefit and his religious

practice. Plaintiff fails to explain in any detail why the denial of his medicine cards or dreamcatcher cause him to violate his religious beliefs. Instead, Plaintiff's main issue appears to be that he thinks the rationale for denying these items is specious. Plaintiff simply contends that his medicine cards and dreamcatcher are not a security threat and therefore he should be allowed to have them. However, considering Plaintiff fails to meet his burden to show that their denial is a substantial burden, the Court does not reach the issue of the rationale for their denial. Instead, Plaintiff's complaints are indicative of marginal inconvenience rather than his being forced to violate his religious beliefs or choose between non-trivial benefits and following his beliefs. *See Diaz v. Collins,* 872 F.Supp. 353, 359-60 (E.D. Tex 1994); *Ali v. Quarterman,* 9:09cv52 2010 WL 3790829 at 13 (E.D. Tex. 2010).

Even if the headband and medicine pouch policy were a substantial burden, Defendant has shown that they have a compelling interest and that the policy is the least restrictive means of enforcing that interest. TDCJ's medicine pouch policy restricts medicine pouch possession to an inmate's cell and religious services. This is particularly important because the religious accommodation for medicine pouches also includes the provision that officers are not allowed to physically handle an inmate's medicine pouch. Medicine pouches may only be inspected visually and can only be handled by the inmate carrying the pouch. Consequently, medicine pouches are a unique security threat because they allow for the introduction and concealment of contraband. Similarly, TDCJ's headband policy limiting the locations where headbands can be worn is the least restrictive means of furthering its legitimate interest in containing the threat to unit

security posed specifically by Plaintiff. Again, Plaintiff is in administrative segregation or chronically mentally ill sheltered housing. Plaintiff was convicted of aggravated assault and possession of a deadly weapon in a penal institution. Following those convictions, Plaintiff was responsible for a staff assault and hostage taking. Because of that incident, Plaintiff was sentenced to additional prison time for attempted capital murder. As Defendant's summary judgment evidence shows, while Plaintiff's infractions did not happen recently, the severity of the incidents coupled with his continued mental health condition poses a unique and ongoing security threat. Defendant has met its burden to show there are no other means of protecting TDCJ's interest in security and safety of its facilities while allowing Plaintiff to possess potentially dangerous items other than by restricting the locations where such items are allowed.

Consequently, Defendant has shown that TDCJ's policy is the least restrictive means necessary to further its legitimate interest in institutional security because the policy allows Plaintiff the freedom to observe his religion with minimal restrictions for 23-hours each day while maintaining TDCJ's ability to ensure that Plaintiff is not able to conceal potentially dangerous contraband in a medicine pouch while moving throughout the unit.

Plaintiff's complaint about growing his hair long is the closest he comes to showing a substantial burden on his religious beliefs. However, Defendant's summary judgment evidence satisfies their burden to show that TDCJ policy regarding hair length, as applied to Plaintiff specifically, is the least restrictive means of furthering TDCJ's compelling interest in institutional security.

The Court must consider the particular characteristics and concerns that Plaintiff presents. TDCJ has a long recognized compelling interest in safety, order, and security. In furthering that interest, TDCJ has implemented grooming standards that aid in inmate recognition, contraband suppression, and increased inmate and staff safety. In some instances, TDCJ has granted specific inmates exemptions to the grooming policy for religious or health reasons. Here, TDCJ deems it necessary to deny Plaintiff an exemption from the grooming policy due to his classification as a high security risk. Although Plaintiff argues that he has not had a disciplinary case in fifteen years, Plaintiff cannot deny the severity of his previous incidents involving possession of a deadly weapon in a penal institution, hostage taking, and attempted capital murder of a prison staff member.

Plaintiff is currently housed in administrative segregation, the most restrictive custody level, due to his hostage taker and staff assaultive security designators. Plaintiff alleges that he was having a psychotic break during the incident in 2000 which led to his attempted capital murder conviction. Defendant's undisputed summary judgment evidence shows that as recently as March 23, 2020, Plaintiff reported experiencing auditory hallucinations and the presence of five voices in his head. Plaintiff contends that he no longer suffers from mental illness. As the record shows, although the hostage-taking and stabbing incident occurred twenty years ago, the severity of the incident necessitates TDCJ's continued diligence in ensuring the safety of staff and other offenders. Plaintiff's requested grooming exemption, if approved, would allow him to grow long hair which he could use to conceal weapons and other contraband. Considering Plaintiff's additional convictions while in TDCJ custody for perpetuating a significant attack

against prison employees, and for possessing a deadly weapon, Defendant has met the burden of showing that a denial of Plaintiff's requested grooming exemption to grow long hair is the least restrictive means of dealing with the extreme security risk Plaintiff poses on the basis of his prior conduct.

Plaintiff complains that another inmate, Terry White, won his court case and is allowed to grow long hair. Plaintiff asserts that "if he can [wear] his hair long, I too should be able to grow my hair long...." However, the context in which Terry White sought an exemption from TDCJ's grooming policy is substantially different from Plaintiff's context. *See White v. Davis, et al.* A-16-CA-059-LY 2017 WL 3274871 (W.D. Tex. 2017). In *White,* the plaintiff was a G2 custody level offender with no violent prison history when he was permitted to grow his hair long. Defendant's summary judgment evidence shows that G2 is a much less restrictive custody level than administrative segregation. White lacked the violent prison disciplinary history, and, unlike Plaintiff, had no record of any instances of smuggling dangerous contraband onto the unit. Consequently, any comparison of the grooming exemption for White is inapplicable to an analysis of the specific challenges posed by Plaintiff and his prior violent incidents.

Plaintiff has failed to satisfy his burden of showing that the exercise of his religion has been substantially burdened by TDCJ's policy regarding headbands, medicine pouches, medicine cards, dreamcatchers, or grooming. In addition, Defendant has met their burden to show that the policies, as implemented in the specific circumstances of Plaintiff's high security risk, are the least restrictive means of achieving their compelling

interest in security. Based on the summary judgment record, Defendants are entitled to summary judgment on Plaintiff's RLUIPA claims.

CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for Summary Judgment (#49) is **GRANTED**.

It is further **ORDERED** that Plaintiff's claims against Defendant are **DISMISSED WITH PREJUDICE**.

It is finally **ORDERED** that all other pending motions are **DISMISSED**.

**SIGNED** on January 14, 2021

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE